**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| **JACQUELINE D. HICKS,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **CIVIL ACTION NO. 5:12-CV-210 (MTT)** |
| **GEORGIA DEPARTMENT OF HUMAN SERVICES,** | ) | |
| **Defendant.** | ) | |

**ORDER**

This matter is before the Court on the Defendant's motion for summary judgment (Doc. 61). For the reasons discussed below, the motion is **GRANTED** as to the Plaintiff's federal law claims. The Plaintiff's state law claim is **DISMISSED without prejudice**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Jacqueline D. Hicks, an African-American female, was employed by Defendant Georgia Department of Human Services's ("DHS") Department of Family and Children Services ("DFCS") from June 1, 2000 until her termination on December 15, 2011.[1] (Doc. 61-2 at ¶ 1). In her final position as an Economic Support Specialist in Taylor County, Georgia, Hicks processed applications for public assistance benefits and interviewed the applicants. (Doc. 61-2 at ¶ 1).

[1] Hicks claims that she did not learn of her termination until December 19, 2011. (Doc. 63 at ¶ 1).

In late June or early July 2011, Angela Love, Supervisor of Muscogee County DFCS, became one of Hicks's supervisors.[2] (Doc. 61-2 at ¶ 1). Love and Hicks were friends but experienced a personal conflict shortly before Love was assigned as Hicks's supervisor, and Hicks believes Love used her position to retaliate against Hicks and manipulate her case files. (Doc. 61-7 at 29:4-30:12). Hicks contends Love further retaliated against her because Hicks reported Love's conduct to Love's supervisors. (Doc. 61-7 at 31:21-24).

Hicks asserts that she also witnessed other employees engaging in illegal conduct and behavior that violated DFCS policies, and she reported that behavior to Sekema Harris Harmon, DFCS County Director for Taylor and Talbot Counties, and Regina Simmons, Economic Support Supervisor, in June 2011.[3] (Doc. 61-7 at 21:13-15; 37:10-22; 40:24-41:1). For instance, Hicks alleges she witnessed several employees change client application dates on a log to give case workers more time to complete applications.[4] (Doc. 61-7 at 38:1-40:6). Hicks contends these complaints resulted in denials of her leave requests, beginning with Simmons's denial of Hicks's request to attend her pastor's funeral in late June 2011. (Doc. 61-7 at 56:6-9). When Hicks asked why the request was being denied, Simmons simply replied, "Ms. Harmon say[s] you can't go." (Doc. 61-7 at 55:13-20). Hicks believes she was also

---

[2] It will become apparent that race was not at issue in this case, although the Court will list the racial makeup of Hicks's supervisors for the record: Angela Love, Sekema Harris Harmon, Kaneisha Harris, Deedre Ligon, and Margaretha Morris are African-American, and Regina Simmons is Caucasian.

[3] Harmon was not one of Hicks's direct supervisors, but Harmon had management responsibility over all employees in Taylor and Talbot County DFCS offices. (Doc. 61-4 at ¶ 3). Hicks alleges Simmons was one of her direct supervisors.

[4] The DFCS standard of promptness requires applications for public assistance benefits to be processed in 28 days and expedited cases to be processed in three days. If the application is not processed in 30 days the case is considered to be "over standard of promptness." (Doc. 61-2 at ¶ 5).

discriminated against in regard to her leave requests because she was asked to provide documentation, such as a doctor's note, while other employees did not have to submit any documentation to justify their leave requests. (Doc. 61-7 at 60:17-61:3).

On September 15, 2011, Hicks requested annual leave for October 14, 2011 and the week of October 17 through October 21, 2011.[5] (Doc. 61-2 at ¶ 9). Love testified that, as of September 15, Hicks was having difficulty with completing her caseload on time, was non-responsive to Love's emails regarding her cases, and would occasionally "become upset, insubordinate, or uncooperative." (Doc. 61-2 at ¶ 10).

On September 27, 2011, Love sent an email to Hicks denying her request and stating, "We as a region have over 156 cases over standard of promptness at this time. And 11 of them belong to you. No leave will be approved at this time." (Doc. 61-23). That same day, Hicks responded by emailing Harmon, Love, and Deedre Ligon, one of Love's supervisors, to complain that she was being discriminated against by being denied her leave request. (Doc. 61-23). Love testified that she verbally informed Hicks on September 28 that her leave request would be approved if she completed all of her assigned casework. (Doc. 61-2 at ¶ 13). Love also testified it was her regular practice to condition granting an employee's leave request on the completion of work assignments. (Doc. 61-2 at ¶ 14). Hicks, however, claims she was not aware of this contingency until Love informed her by email on October 6. (Doc. 63 at ¶ 13).

On September 30, 2011, Hicks submitted a DHS "Unlawful Discrimination Complaint Form," her first internal grievance, to the Georgia Office of Human Resource

[5] Hicks claims she did not initially request off on October 17, 2011 and that leave for that date was requested retroactively. (Doc. 63 at ¶ 9).

Management and Development. (Doc. 61-2 at ¶ 15). Hicks complained of "[r]etaliation for having filed or participated in a previous complaint of unlawful discrimination" and alleged Harmon, Simmons, Love, Ligon, and Kelli Munn, who supervised Hicks while she was a member of a different DFCS team, were responsible for the unlawful retaliation. (Doc. 61-9 at 1). Hicks testified that her grievance was referring to her prior complaints of illegal activities by her coworkers and the resulting denials of her requests to use leave. (Doc. 61-7 at 52:7-14). The complaints in her grievance concerned being unfairly denied leave while her co-workers were regularly allowed to take annual and sick leave without the restrictions imposed on Hicks. Hicks's grievance was forwarded to Kaneisha Harris, the Regional Human Resources Manager of the Office of Human Resource Management and Development, who began contacting Hicks's supervisors and reviewing documentation. (Doc. 61-2 at ¶ 17). Harris determined that Hicks "had a history of leaving work without approval, failure to follow directives regarding leave usage, and issues with not completing her work." (Doc. 61-5 at ¶ 6). Apparently, Harris did not find any merit to Hicks's grievance.

On October 6, 2011, Love sent Hicks a follow-up letter approving her leave request but conditioning that approval on Hicks's completion of a specified list of overdue cases. (Doc. 61-8). Love examined Hicks cases on October 12 and determined Hicks had 34 expedited cases over the standard of promptness and not close to completion. (Doc. 61-2 at ¶ 19). Also on that day, Love gave Hicks a "Memorandum of Concern and Expectations" because Love had concerns with Hicks's performance, including the failure to timely process cases and to follow management's directives, and to give Hicks the opportunity to correct those problems. (Doc. 61-2 at ¶

20). On October 13, Love sent an email to Hicks denying her leave request because the cases outlined in the memo had not been completed. (Doc. 61-6 at 16). In response to the email, Hicks informed Love that she had completed her cases, and according to Hicks, the conversation concluded with Love stating that if the cases had in fact been completed then Hicks had "nothing to worry about." (Doc. 61-7 at 46:14-17).

Hicks did not report to work on October 14 or the following week. (Doc. 61-2 at ¶ 22). Hicks asserts that she did not show up on October 14 because her son became ill the day before, and she requested to use her sick leave, rather than annual leave, to stay home with him.[6] (Doc. 61-7 at 43:20-44:10). The following Monday, October 17, Hicks called Simmons, Ligon, and Love to inform them she needed to use sick leave for that day because her daughter also became ill. (Doc. 61-7 at 44:17-24). Because Hicks was under the impression she had completed her cases and, as a result, her annual leave request had been granted, she did not call in or report to work October 18 through October 21. Hicks testified she did not call in on those days because she did not need to change her absences from annual to sick leave. (Doc. 61-7 at 47:12-16).

Love claimed to be "astonished" that Hicks did not come to work, and Harmon viewed Hicks's actions as "insubordinate." (Docs. 61-4 at ¶ 13, 61-6 at ¶ 19). When Hicks returned to work on October 24, 2011, she claims she discovered some of her completed work had been deleted. (Doc. 61-7 at 44:17-24). Hicks testified it was apparent from the computer system these deletions occurred on October 14 and October 21, and she believes someone did this to bolster the claim that she was not timely completing her work. (Doc. 61-7 at 48:7-15). Further, Hicks testified that, despite

[6] Hicks later submitted a doctor's statement confirming her son's illness on October 14, 2011. (Doc. 61-4 at ¶ 14).

Love's and Harmon's purported reactions to her absence, she did not receive any repercussions for taking leave, and nothing was said to her about it upon her return to work.  (Doc. 61-7 at 49:9-19).

After Hicks returned to work on October 24, Love believed Hicks made no improvement in her performance.  (Doc. 61-6 at ¶ 20).  Love reminded Hicks of her cases on which no action had been taken on October 28 and followed up with her via email on November 2 regarding the same.  (Doc. 61-6 at ¶ 21).  Love believed further action was needed to address Hicks's continuing work performance issues.  (Doc. 61-6 at ¶ 22).  Later on November 2, Hicks went to Harmon's office and informed Harmon she was going to leave work early because she was having an anxiety attack.  (Doc. 61-2 at ¶ 25).  According to Hicks, she told Love about her situation prior to going to Harmon's office, and Love did not deny her permission to leave but merely inquired whether Hicks had a ride home.  (Doc. 61-7 at 61:23-25).  Harmon, however, did not believe Hicks was having an anxiety attack because Hicks was able to walk into Harmon's office without assistance, and she did not appear to have labored breathing.  (Doc. 61-4 at ¶ 15).  Harmon informed Hicks that she would not approve Hicks's leave that day and did not give Hicks permission to leave.  (Doc. 61-4 at ¶ 15).  According to Harmon, "Hicks stated that she did not care what [Harmon] approved or what [Harmon] said, she was leaving anyway."  (Doc. 61-4 at ¶ 15).  Harmon observed that Hicks already had a ride waiting for her in the parking lot, and Hicks "stormed out" of Harmon's office and left work.  (Doc. 61-4 at ¶ 15).  Harmon considered Hicks's "actions to be very defiant."  (Doc. 61-4 at ¶ 15).

Hicks went to the doctor the following day, sent her doctor's excuse to human resources, and called Love to let her know what was going on. (Doc. 61-7 at 62:15-20). Harmon reported this incident to Harris, and Harris considered it to be a "situation of leave abuse." (Doc. 61-5 at ¶¶ 9-10). Shortly thereafter, Harmon and Margaretha Morris, the Regional Director over Hicks's office, requested that Harris terminate Hicks. (Doc. 61-5 at ¶ 11). On November 8, 2011, Harris responded by declining to terminate Hicks because she was a long-term employee who had only recently displayed performance issues. (Doc. 61-5 at ¶ 11). Hicks did not return to work until November 22, 2011.[7] (Doc. 61-7 at 65:20-24).

During her absence, Hicks filed a "DHS Unclassified Service Grievance Form," her second internal grievance, on November 15, 2011 to complain about not receiving her most recent paycheck, intentional damage to items in her office, others tampering with her cases, and supervisors purposefully assigning cases to her that were close to exceeding the standard of promptness. (Doc. 61-10). Hicks alleged the supervisors involved were Love, Simmons, Ligon, and Harmon, and she requested to be moved to a different county office. (Doc. 61-10).

Rather than terminate Hicks, Harris worked with Love and Harmon to draft a letter of reprimand and create attendance and work plans for Hicks, which were issued to her in a meeting on December 1, 2011. (Doc. 61-5 at ¶¶ 11-12). Harris, however, did not attend the meeting. Instead, the meeting was conducted by Harmon, Simmons, and Love. (Doc. 61-4 at ¶ 21). The written reprimand accused Hicks of "misconduct

[7] Hicks testified that she received two letters from DHS informing her that her doctor's excuse had been received and that she qualified for medical leave. (Doc. 61-7 at 62:21-63:8). It is not clear whether Hicks was on approved leave pursuant to the Family Medical Leave Act because Harmon testified that Hicks was not paid for the days she was absent during the November 1 through November 15, 2011 pay period. (Docs. 61-2 at ¶ 29; 61-4 at ¶ 16).

and negligence and inefficiency in the performance of [her] job duties" specifically for: failure to meet case management standards; a pattern of excessive use of leave, including failure to adhere to leave request and absence reporting procedures; failing to report on October 18 through October 21, 2011 when leave was denied; and leaving work without approval on November 2, 2011.  (Doc. 61-11 at 1).  The reprimand outlined a list of expectations of Hicks, and the attendance plan advised her that continued absenteeism and failure to follow leave request procedures would result in further disciplinary action, including termination.  (Docs. 61-11 at 1-2; 61-12 at 2).  At the meeting, Hicks accused Love, Harmon, and Harris of retaliating against her because of the allegations in her two grievances.  (Doc. 61-7 at 78:5-79:8).  Hicks also testified that she attempted to show her supervisors proof of her completed cases, but they refused to review her documentation.  (Doc. 61-7 at 80:24-81:11).  When Hicks informed her supervisors that she had reported them to the state office, Harmon responded, "Who [do] you think they're [going to] believe?  You or the three of us?  It's three against one, Ms. Hicks.  It's three against one."  (Doc. 61-7 at 81:12-21).

After the plans were issued, Hicks was required to provide documentation before and after her medical appointments for her leave requests to be approved.  (Docs. 61-4 at ¶ 26; 61-6 at ¶ 24).  On the same day as the meeting, Hicks requested to work partial days on December 5, December 7, December 8, December 9, and December 14, 2011 for medical testing, and she provided Love with a doctor's note stating that the testing was medically necessary and could not be performed after working hours.  (Docs. 61-2 at ¶ 35; 61-15).  Hicks later requested to take the entire day off on December 8 for medical testing, but Love denied her request for December 8 because she had not

received a notice from Hicks's doctor to excuse Hicks for the full day. (Docs. 61-2 at ¶ 36; 61-6 at 24). Hicks did not report to work on December 8. (Doc. 61-2 at ¶ 37).

When Hicks returned to work on the morning of December 9, Harmon claims she went to Hicks's office to obtain documentation regarding her absences. Harmon believed Hicks was not working because she did not have work on her desk and her computer log-in screen was pulled up. (Doc. 61-4 at ¶ 29). Hicks, however, testified that she approached Harmon to provide her with a doctor's excuse for the three prior days of missed work because Love's email directed Hicks to provide Harmon with a copy. (Docs. 61-14; 61-16).[8] Harmon allegedly responded that she would not accept anything from an employee and that she wasn't Hicks's supervisor. (Doc. 61-7 at 91:15-92:1). Hicks then faxed the excuse to Love and left the office when she was approved to leave. (Docs. 61-2 at ¶ 39; 61-7 at 96:9-10). Harmon proceeded to email her supervisors, Harris and Morris, to inform them that Hicks did not provide her with any documentation regarding her doctor's appointments, summarizing their interactions on the morning of December 9, and concluding:

> It seems as if Ms. Hicks is not going to adhere to any of the documents presented to her in relation[] to corrective action. It has become an every day event dealing with her antics. I would like some resolution to this on-going problem, which is causing disservice to our customers and taking entirely too much time and energy. Please advise.

(Doc. 61-4 at ¶¶ 30-31). Harris responded by telling Harmon and Morris, if they agreed, she would submit a request for Hicks's termination "based on non-compliance with the

[8] The doctor's excuse confirms the dates of Hicks's medical testing for December 5, December 7, and all day December 8, 2011. (Doc. 61-16). Hicks claims that her doctor faxed this to her office when she returned on the morning of December 9. Although the time stamp on the original fax line does not show whether the excuse was faxed in the morning or evening, the fax line does show the excuse was faxed on December 9, 2011 at 9:32, which is consistent with Hicks's allegations. (Doc. 61-16).

reprimand she received." (Doc. 61-5 at ¶ 15). Harmon and Morris confirmed their agreement. (Doc. 61-5 at ¶ 15).

Apparently, Harris understood Harmon's email to mean Hicks left work, without approval, on the morning of December 9, 2011. (Doc. 61-5 at ¶ 14). Harmon did not speak further with Hicks about the events of December 9, and Harmon claims she was "under the impression … Hicks was terminated for failure to comply with the corrective actions we had put in place." (Doc. 61-4 at ¶ 33). Harmon also claims she was unaware Harris had interpreted her email to mean Hicks had left work without approval on the morning of December 9, and Harmon and Harris contend they did not become aware of this miscommunication until Hicks filed her case in this Court. (Docs. 61-4 at ¶¶ 34-35; 61-5 at ¶¶ 22-24).

On the afternoon of December 9, Harris emailed the appropriate authorizing officials to request permission to terminate Hicks. (Doc. 61-5 at 17). Harris stated, "Taylor County DFCS requests separation of Ms. Hicks for her failure to comply with the written reprimand she received on December 1, 2011, regarding attendance and performance issues. Specifically, on Friday[, December 9, 2011], she did not follow supervisory directives[,] and she left early from work (at 9:32 am) without approval." (Doc. 61-5 at 17). Harris's email went on to state that Hicks "failed to report to work as scheduled and/or call in on [October 14] and [October 17 through October 21, 2011]," although Hicks had called in on October 14 and October 17. (Doc. 61-5 at 17). Based on Harris's recommendation, Hicks's termination was approved. (Doc. 61-2 at ¶ 46).

On December 13, Harmon and Morris took Hicks into a conference room around 3:00 pm to inform her she was being suspended. (Doc. 61-7 at 97:20-98:11). Morris

and Harmon would not provide Hicks with a reason for her suspension other than that she was being "investigated for misconduct." (Doc. 61-7 at 100:5-9). They told Hicks she would have to call Harris if she wanted to know the basis for her suspension. (Doc. 61-7 at 100:10-12). Hicks tried calling Harris and left several messages, but Harris did not call her back. (Doc. 61-7 at 100:13-17). Although Hicks had already been suspended and escorted out of the building, Love sent her an email at 4:43 pm on December 13 informing her she could not approve any additional dates requested off and that she still had not received any doctor's excuse for December 8, 2011. (Doc. 61-17). On December 15, Harmon issued a letter terminating Hicks's employment, and Hicks received the letter on December 19. (Docs. 61-7 at 100:13-15; 61-19).

     Hicks filed her complaint in this Court on June 7, 2012. (Doc. 1). On March 8, 2013, DHS moved to dismiss most of Hicks's claims, and the Court subsequently dismissed her claims of discrimination and hostile work environment pursuant to Title VII, defamation, breach of contract, violations of the Family and Medical Leave and Fair Labor Standards Acts, and discrimination and retaliation pursuant to the Americans with Disabilities Act. (Docs. 36, 38). DHS did not move to dismiss Hicks's Title VII retaliation claim or her Georgia Whistleblower Act claim. Hicks then moved to amend her complaint to reassert Title VII discrimination and hostile work environment claims, and the Court granted that motion as unopposed. (Docs. 50, 55). DHS has now moved for summary judgment on Hicks's pending claims – discrimination, hostile work environment, and retaliation pursuant to Title VII and violation of the Georgia Whistleblower Act.

## II. DISCUSSION

### A. Motion for Summary Judgment Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A factual dispute is genuine only if 'a reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop*., 941 F.2d 1428, 1437 (11th Cir. 1991)). The burden rests with the moving party to prove that no genuine issue of material fact exists. *Info. Sys. & Networks Corp.*, 281 F.3d at 1224. The party may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

The burden then shifts to the non-moving party, who must rebut the movant's showing "by producing … relevant and admissible evidence beyond the pleadings."[9] *Josendis v. Wall to Wall Residence Repairs, Inc*., 662 F.3d 1292, 1315 (11th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). The non-moving party does not satisfy her burden "if the rebuttal evidence is 'merely colorable, or is not significantly probative' of a disputed fact." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*,

[9] DHS argues that its statement of facts should be deemed admitted because Hicks did not sufficiently deny any of DHS's facts by pointing to contrary evidence in the record, and Hicks failed to submit her own statement of facts. The Court has reviewed the record and finds that Hicks has produced evidence to show the facts are disputed. Thus, it is not appropriate to find DHS's statement of facts admitted.

477 U.S. 242, 249-50 (1986)). However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge … . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Anderson*, 477 U.S. at 255 (citation omitted).

**B. *McDonnell Douglas* Framework**

A Title VII plaintiff may prove his case directly or circumstantially. Here, there is no direct evidence of discrimination, so Hicks must rely on circumstantial evidence. The framework for analyzing circumstantial evidence to establish a prima facie case of discrimination is provided in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[10] Pursuant to *McDonnell Douglas*, a plaintiff must first establish a prima facie case of discrimination. If a plaintiff establishes a prima facie case of discrimination, the burden of production, but not the burden of persuasion, shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment action. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981). This burden of production means the employer "need not persuade the court that it was *actually* motivated by the proffered reasons" but must produce evidence to raise a genuine factual dispute as to whether it discriminated against the plaintiff. *Kragor v. Takeda Pharm. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012) (emphasis added) (citation omitted).

[10] The Court recognizes that establishing the *McDonnell Douglas* elements is not "the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). A plaintiff can always avoid summary judgment by creating a triable issue concerning the employer's discriminatory intent. A plaintiff does this by presenting "'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" *Id.* (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 734 (7th Cir. 2011)). However, Hicks has not presented such evidence and does not meet *Lockheed-Martin's* standard.

A plaintiff then has the opportunity to show that the employer's stated reason is in fact pretext for discrimination. "The plaintiff can show pretext 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Id.* (quoting *Burdine*, 450 U.S. at 256). Put another way, "a plaintiff can survive a motion for summary judgment … simply by presenting evidence sufficient to demonstrate a genuine issue of material fact as to the truth or falsity of the employer's legitimate, nondiscriminatory reasons." *Evans v. McClain of Ga., Inc.,* 131 F.3d 957, 964-65 (11th Cir. 1997) (citations omitted). Consequently, at this juncture it is not required that a plaintiff prove her employer was motivated by discriminatory intent.

**C. Race Discrimination and Hostile Work Environment Claims**

DHS contends Hicks's race discrimination and hostile work environment claims are barred because she failed to include those claims in her charge of discrimination filed with the EEOC. Prior to filing a Title VII action, a plaintiff must file a charge of discrimination with the EEOC. *Gregory v. Ga. Dep't of Human Res.*, 355 F.3d 1277, 1279 (11th Cir. 2004) (citation omitted). The purpose of the exhaustion requirement is to permit the EEOC the first opportunity to investigate the alleged discriminatory or retaliatory practices, and "a plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Id*. at 1279-80 (internal quotation marks and citations omitted). However, "the scope of an EEOC complaint should not be strictly interpreted" to avoid Title VII claims being easily barred by procedural technicalities. *Id*. at 1280 (internal quotation marks and citations omitted).

Liberally construing Hicks's EEOC charge, the Court cannot find the facts alleged in her charge encompass claims of discrimination and a hostile work environment based on her race. Hicks checked "retaliation" and "disability," but not any characteristic protected by Title VII, as the bases for DHS's alleged discrimination. (Doc. 61-24). In her narrative, Hicks states, "I believe that I have been discriminated against because I was regarded as a person with a disability, and in retaliation for opposing unlawful employment practices, in violation of Title I of the Americans with Disabilities Act of 1990, as amended." (Doc. 61-24). Her remaining allegations focus on the denials of medical leave and her suspension and subsequent termination for alleged misconduct. Nowhere does Hicks state she believes she was discriminated against, retaliated against, or harassed because of a Title VII protected characteristic.

Hicks argues that her EEOC charge states race discrimination and hostile work environment claims because she identified a white female who was treated more favorably in her EEOC intake questionnaire. First, the intake questionnaire clearly states that a charge of employment discrimination must still be filed, and the questionnaire is not itself a charge. Second, even if the intake questionnaire was construed as part of Hicks's charge, the questionnaire would not save her race discrimination and hostile work environment claims. Hicks did not allege facts in her questionnaire suggesting any discrimination or harassment occurred because of her race. Rather, Hicks identified Miriam Palmer, a white female, in response to a question asking her to list other employees who were treated better than her. The questionnaire asked Hicks to identify the protected characteristics relevant to her discrimination or

retaliation claims, but Hicks identified characteristics of Palmer that were not relevant to any of her allegations in the questionnaire.

Hicks's race discrimination and hostile work environment claims lack merit for an even more fundamental reason. Hicks admitted multiple times in her deposition that she was not treated differently because of her race. For instance, when asked whether she was "contending as part of [her] lawsuit that [she was] discriminated against based on [her] race," Hicks responded, "No. I've been discriminated [against] because I was a person that was known to have a disability." (Doc. 61-7 at 122:8-24). Thus, even if Hicks had properly asserted these claims in her EEOC charge, she would not be able to establish a prima facie case of race discrimination or a hostile work environment based on her own admissions. Accordingly, DHS is entitled to summary judgment on Hicks's Title VII race discrimination and hostile work environment claims.

**D. Title VII Retaliation Claim**

Under Title VII, an employer may not retaliate against an employee because the employee "has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation, a plaintiff must show that (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression. *Dixon v. The Hallmark Cos.*, 627 F.3d 849, 856 (11th Cir. 2010) (citations omitted). DHS argues that Hicks cannot establish a prima facie case because she did not engage in statutorily protected expression.

Hicks bases her claim on a September 27 email complaining of discrimination and her two internal grievances. Hicks essentially alleges her supervisors and others in the chain of command, particularly Love, Simmons, and Harmon, treated her less favorably than all Taylor and Talbot County DFCS employees. When Hicks began to complain about that treatment and her coworkers' alleged illegal conduct, she contends they orchestrated a scheme to force her out of DFCS. They did so by deleting her completed work; purposefully reassigning to her cases requiring immediate attention; denying her leave requests for "failure to complete" that work; and making misrepresentations to Harris to secure Hicks's termination. Hicks has produced substantial evidence to support her allegations.

While Hicks has produced evidence that she was retaliated against, she has not presented evidence nor does she contend that she was retaliated against because she complained about an unlawful employment practice involving a Title VII protected characteristic. Her grievances stated she was being intentionally harassed by her supervisors and treated more harshly than her coworkers, but they did not allege any DHS employment practice was related to her race or any other protected characteristic. Further, Hicks testified that her complaints of unfair treatment were based on her disability and her reports regarding violations of DHS procedures. Thus, Hicks did not engage in protected expression under Title VII. *See* 42 U.S.C. § 2000e-2(1) ("It shall be an unlawful employment practice for an employer … to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin … ."); *Coutu v. Martin Cnty. Bd. of*

*Cnty. Comm'rs*, 47 F.3d 1068, 1074 (11th Cir. 1995) ("Unfair treatment, absent discrimination based on race, sex, or national origin, is *not* an unlawful employment practice under Title VII.").

Accordingly, Hicks has failed to establish a prima facie case of retaliation pursuant to Title VII, and DHS is entitled to summary judgment on this claim.

## III. CONCLUSION

For the foregoing reasons, DHS's motion for summary judgment is **GRANTED** as to Hicks's federal law claims. The Court declines to exercise supplemental jurisdiction over Hicks's state law claim, and that claim is **DISMISSED without prejudice**.[11] *See* 28 U.S.C. § 1367(c)(3); *Amazing Grace Bed & Breakfast v. Blackmun*, 2011 WL 777892, at *2 (S.D. Ala.) (citations omitted) (noting that a preference to dismiss state claims when federal claims are dismissed prior to trial "also applies when the federal claims are eliminated on motion for summary judgment"). Further, Hicks's motion to compel production of documents (Doc. 64) and motion to subpoena administrative transcript of tribunal hearing (Doc. 65) are **DENIED as moot**.

**SO ORDERED**, this the 4th day of March, 2014.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT

[11] When a court declines to exercise supplemental jurisdiction, any state limitations period "shall be tolled while the claim is pending [in federal court] and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period." 28 U.S.C. § 1367(d). Thus, Hicks has the opportunity to pursue her state claim in state court without subjecting it to any limitations defense to which it is not already subject.